CLERK'S OFFICE
A TRUE COPY

Dec 12, 2025

s/ MMK

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin



AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❐ Original          ❐ Duplicat

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>3957 North 98th Street Milwaukee, Wisconsin,<br>to include its garage (Target Location), as<br>further described in Attachment A 1 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   25      MJ      219

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A1.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____12/26/2025_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.      ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. William E. Duffin_____ .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for _____ days *(not to exceed 30)*      ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:       12/12/2025 at 10:30 a.m.          *William E. Duffin*
                                                               *Judge's signature*

City and state:       Milwaukee, WI          Honorable William E. Duffin, U.S. Magistrate Judge
                                                               *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A1

## PLACE TO BE SEARCHED

**Attachment A1: 3957 North 98th Street Milwaukee, Wisconsin -** to include the garage (Target Location). This address is utilized by Maurice HAMPTON Jr. and Ka'Lynn A.G. Baxter. Described as a one-story, single-family residence with a tan/brown roof. The roof has bark brown gutters affixed with cream colored brick and dark brown shingle style siding. A small concrete porch leads to the front entry door. The residence is situated on the west side of North 98th Street with the front entrance facing east. "3957" is affixed to a wooden column on the north side of the front door. The main entry door has a glass/screen style storm door leading to a solid entry way door. The garage and vehicle slab is located adjacent to the alleyway behind the residence. The garage has cream colored siding with a brown roof and dark brown gutters affixed with "3957" affixed next to the garage overhead door which faces west.





**ATTACHMENT B**

**ITEMS TO BE SEIZED**

Two Apple iPhones, previously possessed by Jeremiah HILSON on December 2, 2025 and later provided to Maurice HAMPTON Jr. as described on recorded jail call from December 2, 2025 (**TARGET TELEPHONES**), which may be found at the Target Location, Target Vehicle 1, Target Vehicle 2, and/or on the Target Person.



CLERK'S OFFICE
A TRUE COPY
Dec 12, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3957 North 98th Street Milwaukee, Wisconsin, to include its garage (Target Location), as further described in Attachment A1 | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No.  25  MJ  219 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A1.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; & 843(b); and 18 U.S.C. §§ 924 (c) and 922(n) | Possession with Intent to Distribute; Conspiracy to Distribute Controlled Substances; Illegal Use of a Communication Facility;  possession of a firearm in furtherance of drug trafficking, possession of a firearm by a person under indictment. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aaron Hoppe, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:  12/12/2025

_____
*Judge's signature*

City and state:  Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR SEARCH WARRANTS

I, Aaron Hoppe, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the following premises, vehicle, and person, further described in Attachments A1, A2, A3, and A4 (collectively, "Attachments A"), for the things described in Attachment B, namely the **TARGET TELEPHONES**:

A1. 3957 North 98th Street Milwaukee, Wisconsin, to include its garage (Target Location);

A2. 2020 Lexus NX, bearing Wisconsin license plate APT-3844 (Lexus) (Target Vehicle 1);

A3. 2020-2021 grey Jeep Grand Cherokee Sport Utility vehicle, with matching grey rims, and a "Napleton Auto Group" dealer placard displayed on the rear registration bracket (Target Vehicle 2); and

A4. the person of Maurice F. HAMPTON Jr, a.k.a. "Big Droop" (DOB XX/XX/1997).

2. I have been a law enforcement officer since May 30, 2007. I am currently assigned to the Waukesha County Sheriff's Department Detective Bureau. I have been assigned to a Federal Drug Task Force (Milwaukee High Intensity Drug Trafficking Area (HIDTA)) and have been assigned to the Waukesha County Metro Drug Unit in 2012-2013, 2015-2017, and from 2022-Present. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3. I have been a part of hundreds of state and federal investigations related to drug activity. I have received extensive training on the investigation of death investigation, narcotics investigation, cell phone analytics, and I am currently a member of the Board of Directors for the

Wisconsin Association of Homicide Investigation.

4. I have conducted investigation ranging from death, drug, firearm, property, and child exploitative crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting an investigation into many drug investigations, and drug related death investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics will mainly utilize their cell phone to set up a transaction for narcotics utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos, which are also used by drug traffickers.

5. I have received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I have been trained regarding these offenses and has arrested individuals for federal firearms related offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 18, United States Code, Section 922(o) and Title 21, United States Code, Sections 841 and 846. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

6.      I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested.  On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

7.      I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

8.      Based on training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

a.      I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States.

b.      I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances.

c.     I know that it is common for persons involved in the sales of controlled substances to be armed with guns and/or to keep firearms in their residence/apartment for their protection and the protection of their controlled substances. I also know it is common for those engaged in drug trafficking to utilized security cameras to surveille their residences, stash houses, and other locations to protect themselves from drug rivals and law enforcement detections.

d.     It is a common practice for individuals engaged in high level drug trafficking activities to use multiple locations to conduct their drug trafficking activities. For example, a "stash house" is a location used to store controlled substances, firearms, and U.S. Currency.

e.     I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

f.     I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

g.     I know it is common for persons involved in large-scale drug trafficking and related financial crimes to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as drug ledgers, currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods, even several years. These items are maintained by the traffickers within residences, stash houses, vehicles, or other locations over which they maintain dominion and control.

h.     I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them.

Page 4

i. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

j. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

k. Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

l. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities.

m. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering and structuring activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

n. I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s).

p. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering and structuring activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

q. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or related financial crimes; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

9. Affiant is participating in an investigation of heroin/fentanyl drug trafficking organization (DTO) involving Jeremiah D. HILSON, a.k.a. "Man-Man", MAURICE F. HAMPTON JR., a.k.a. "Big Droop", "Droop", and others. Affiant is familiar with the facts and circumstances regarding this investigation as a result of my personal knowledge and participation in this investigation, and my review of: (a) documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures by MPD (b) reports prepared by, and

information obtained from, other federal, state, and local law enforcement agents and officer prepared during the course of their official duties, all of which I believe to be truthful and reliable; (c) information obtained from witnesses, including confidential sources, whose reliability is established separately herein; and (d) review of record jail / prison calls with inmates. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of Affiant's knowledge about this matter.

10.     Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

11.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of possession of a firearm in furtherance of drug trafficking, possession of a firearm by a person under indictment, distribution and possession with intent to distribute controlled substances, use of a communication device to facility a drug trafficking offense, and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 18, United States Code, Sections 924(c) and 922(n); and Title 21, United States Code, Sections 841, 843, and 846, have been committed by Jeremiah D. HILSON, a.k.a. "Man-Man", MAURICE F. HAMPTON JR., a.k.a. "Big Droop", "Droop", and other identified and unidentified subjects. There is also probable cause to search the information described in Attachment As for evidence of these crimes further described in Attachment B.

## PROPERTIES AND PERSON TO BE SEARCHED
## (COLLECTIVELY, "ATTACHMENTS A")

**Attachment A1: 3957 North 98th Street Milwaukee, Wisconsin -** to include the garage (Target Location). This address is utilized by Maurice HAMPTON Jr. and Ka'Lynn A.G. Baxter. Described as a one-story, single-family residence with a tan/brown roof. The roof has bark brown gutters affixed with cream colored brick and dark brown shingle style siding. A small concrete porch leads to the front entry door. The residence is situated on

the west side of North 98th Street with the front entrance facing east. "3957" is affixed to a wooden column on the north side of the front door. The main entry door has a glass/screen style storm door leading to a solid entry way door. The garage and vehicle slab is located adjacent to the alleyway behind the residence. The garage has cream colored siding with a brown roof and dark brown gutters affixed with "3957" affixed next to the garage overhead door which faces west.





**Attachment A2**:   2020 Lexus NX, bearing Wisconsin license plate APT-3844 (Lexus) (Target Vehicle 1).

**Attachment A3:**   2020-2021 grey Jeep Grand Cherokee Sport Utility vehicle, with matching grey rims, and a "Napleton Auto Group" dealer placard displayed on the rear registration bracket (Target Vehicle 2);

Page 8

**Attachment A4**:      the person of Maurice F. HAMPTON Jr, a.k.a. "Big Droop" (DOB XX/XX/1997) (Target Subject).

## PROBABLE CAUSE

### A.     Background and Summary of Investigation

12.     The United States government, including the HIDTA, DEA, Waukesha County Sheriff's Department and the Waukesha County Metro Drug Unit, is conducting a drug trafficking investigation of Jeremiah D. HILSON, a.k.a. "Man-Man", Maurice F. HAMPTON Jr., a.k.a. "Big Droop", "Droop", and other identified and unidentified individuals for crimes of possession of a firearm in furtherance of drug trafficking, possession of a firearm by a person under indictment, distribution and possession with intent to distribute controlled substances, use of a communication device to facility a drug trafficking offense, and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 18, United States Code, Sections 924(c) and 922(n); and Title 21, United States Code, Sections 841, 843, and 846.

13.     Case agents conducted a debrief in March and April 2025 with a confidential source (CS-1). CS-1 provided case agents with information concerning two individuals that were selling large amounts of heroin/fentanyl and methamphetamine. CS-1 provided information that one of the individuals had recently been indicted in a federal investigation and was "the only one released" from custody. CS-1 provided a nickname for this individual as "Droop." The CS-1 provided information regarding the second individual as "Nut" and stated that "Nut" and "Droop" are family members of the co-defendants who were federally indicted with "Droop." CS-1 advised that the basis of CS-1's knowledge concerning the drug trafficking of "Droop" and "Nut" comes from CS-1's own personal observations.

14.     Case agents believe that CS-1 is credible and reliable. CS-1 has provided information concerning individuals involved in illegal activities which has been independently

verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, surveillance, and from search warrant executed. CS-1 has no arrests or convictions relating to dishonesty but has past arrests or convictions for felony drug offenses, inducing possession with intent to deliver cocaine, possession with intent to deliver/manufacture a controlled substance, manufacture/deliver cocaine, possession of THC, possession with intent to deliver heroin, and maintaining a drug trafficking place. At the time of cooperation, CS-1 had an open case through Waukesha County for felony battery and bail jumping, and misdemeanor traffic offenses. CS-1 cooperated with case agents in hope of receiving consideration for CS-1's open/pending Waukesha County criminal and traffic offenses. Since CS-1 cooperation has been completed, the Waukesha County charges were dismissed. The information provided by CS-1 concerning what occurred during each of these buys was corroborated by case agent surveillance and/or review of covertly recorded audio and/or video made by CS-1 of the transactions at the request of case agents. CS-1's information has never been found to be false or misleading. For these reasons, I consider CS-1 to be reliable.

15. In a related investigation, case agents previously identified "Droop" or "Big Droop" as Maurice F. HAMPTON Jr. (DOB XX/XX/1997). HAMPTON JR. was federally indicted in the Eastern District Court of Wisconsin Case 24-CR-28 on February 14, 2024, for charges related to the possession and distribution of controlled substance, knowingly and intentionally using a communication facility, namely, a telephone in facilitating the commission of an act and acts constituting a felony, knowingly possessing firearms in furtherance of a drug trafficking offense, in violation of Title 21, United States Code, Section 841(a)(1), 841(b), and 843(b) and Title 18, United States Code, Sections 2(a) and 924(c)(1)(A)(i). HAMPTON Jr. was taken into custody on

February 7, 2024, pursuant to a criminal complaint and federal arrest warrant, but was released a short time after his initial court appearance.

16.     In a related investigation, case agents previously identified "Man Man" as Jeremiah D. HILSON (DOB XX/XX/1993). HILSON was federally indicted in the Eastern District Court of Wisconsin Case 25-CR-72 on April 15, 2025, for charges related to the possession and distribution of controlled substance, knowingly and intentionally using a communication facility, namely, a telephone in facilitating the commission of an act and acts constituting a felony, knowingly possessing firearms in furtherance of a drug trafficking offense, in violation of Title 21, United States Code, Section 841(a)(1), 841(b), and 843(b) and Title 18, United States Code, Sections 2(a) and 924(c)(1)(A)(i). HILSON was taken into custody on April 3, 2025, pursuant to a criminal complaint and federal arrest warrant, but was released a short time after his initial court appearance

17.     Based on the investigation in Case 24-CR-28 in 25-CR-72 and review of federal court records related to that matter, case agents are aware the majority of HAMPTON Jr.'s charged co-defendants in case 24-CR-28 were ordered detained, consistent with CS-1's information. Case agents are aware that HAMPTON Jr, HILSON, and a female defendant are the only co-conspirators in case 24-CR-28 and 25-CR-72 to date, to be released from custody. Further, case agents are aware based on the investigation in case 24-CR-28 and 25-CR-72 that many of HAMPTON Jr.'s and HILSON charged co-defendants are related to each other or maintain a family-like relationship, like co-conspirator Qian COLLINS, also consistent with CS-1's information.

18.     Case agents identified another co-defendant ("Nut") as Montrell D. HILSON. Case agents had previous contacts with Montrell D. HILSON, who had acknowledged that he goes by

"Nut." Case agents had previously identified Montrell D. HILSON, Jermiah D. HILSON, and HAMPTON Jr., as family members of Qian COLLINS and multiple other co-defendants in case 24-CR-28 and 25-CR-72. Case agents then showed previously obtained pictures of Montrell D. HILSON, Jeremiah D. HILSON, and HAMPTON Jr. to CS-1 who positively identified Montrell D. HILSON as "Nut", HAMPTON Jr. as "Droop," and Jeremiah D. HILSON as "Man Man".

### B. Devenire D. MATLOCK homicide

19. While conducting an unrelated investigation, case agents learned of a homicide that occurred in the City of Milwaukee on November 6, 2025, which is currently being investigated by the Milwaukee Police Department (MPD), refer to MPD IR #C2511070016. The homicide occurred in front of 1255 West Ring Avenue, Milwaukee, Wisconsin.

20. On November 6, 2025, at 8:26 pm MPD officers were dispatched to 1255 West Ring Avenue after family members located MATLOCK in a vehicle suffering from multiple gunshot wounds to the head. MPD Officer's and EMS personnel arrived but MATLOCK was declared deceased. MATLOCK's family members admitted to officers that MATLOCK was known to sell marijuana. MATLOCK informed his girlfriend that he was meeting with someone at 7:00 pm to sell some marijuana and was going to go to the "club" afterwards. Officers did not locate any narcotics or money inside the vehicle after completing a search of the vehicle. MPD did not identify any known suspects and are currently investigating this as a drug related homicide.

### C. Review of jail calls

21. On November 7, 2025, case agents were monitoring jail calls for an unrelated investigation and learned of multiple recorded jail calls that contained evidentiary information related to MATLOCK's homicide.

22. The first call was on November 6, 2025, at 10:39 am. The call was prior to the

MATLOCK's homicide. The record jail call was made from inmate Marquise MAYES's (hereafter referred to M. MAYES) Personal Identification Number (PIN), to telephone number 262-316-1448, which case agents believe to be Anthony SMITH (AKA "Crack"). Case agents identified 262-316-1448 based on review of open-source record databases, toll analysis, and content discussed during recorded jail calls.

23. During the call, M. MAYES states "you aint tell me what's his name busted Racine, Dennis, and Devenire, like 4-5 days ago". Based on my training and experience, I know the term "busted" to be used by individuals to refer to someone robbing an individual. Based on this statement, I believe that M. MAYES was discussing an unknown person robbing three individuals (Racine, Dennis, and Devenire). SMITH states "Devenire been with us at the shop every day, I know they just bust Man Man and it wasn't Racine. They just robbed Man Man on 40th for 20 pounds, 5 bowls of ice and 8500 but all of it was LA's and it wasn't Racine". Based on my training and experience, I believe SMITH statements refer to someone robbing ("bust" and "robbed") Jeremiah HILSON ("Man Man") of controlled substance ("20 pounds and 5 bowls of ice") and money ("8500"). Based on my prior investigation into Jeremiah HILSON, I am aware that he would traffick controlled substances on the northside of Milwaukee, near 40th Street and Capitol, which was near where he resided, 32XX North 42nd Street, Milwaukee, Wisconsin. I also know that Jeremiah HILSON is known by the nickname "Man Man". Further, I am aware that the term "ice" is used by drug traffickers to refer to crystal methamphetamine and the term "bowls" is used when discussing methamphetamine drug weights. Further, based on my training and experience, I am aware that the term "pounds" is used by drug traffickers when discussing marijuana weights and the statement "20 pounds" would be consistent with 20 pounds of marijuana. Further, based on SMITH statements, it appears SMITH is stating the Devenire could not have committed the

robbery, because Devenire was with SMITH (Devenire been with us at the shop every day..").

24.     SMITH continues "someone robbed Baby D".  Based on another drug trafficking investigation case agents are aware that "Baby D" is a nickname for Devonte MAYES (hereafter referred to as D. MAYES).  Case agents reviewed Wisconsin Department of Corrections record which identified D. MAYES as M. MAYES's brother.  Further, case agents have reviewed recorded jail calls in which the context discusses M. MAYES and D. MAYES as brothers. SMITH states "dude be with Dev and them shit".  Based on my training and experience, I believe this statement again refers to Devenire not being involved in the robberies.

25.     Later in the call, M. MAYES states he talked to "Coo" and "Coo" told him that "Devenire and Dennis busted dude for a 20 pack and 9 g's".  Based on my training and experience, this statement refers to "Devenire" and "Dennis" robbing (busted) and individual for controlled substance.  I am aware that drug traffickers refer to "pack(s)" when discussing drug weights and may be used when referring to pounds of marijuana.  Further I am aware that "g's" is often used as a slang term to refer to $1,000.  Therefor I believe the robbers took 20,000 fentanyl pills and $9,000 during the robbery of the drug trafficker.

26.     M. MAYES then asks SMITH to "call Baby D" to ask him who "busted Racine" and SMITH responds, "Devenire and Dennis bust lil Man Man off 40th".  Based on my training, experience, and investigation into HAMPTON Jr., Montrell HILSON, and Jeremiah HILSON, I believe SMITH was stating "Devenire" and "Dennis" robbed (bust) Jeremiah HILSON (lil Man Man off 40th).  SMITH continues on the jail call "Devenire, Dennis, and Scoot come out and bust Man Man, they the 20 piece, the bowls with the ice in the car, and 8500, LA called me with the P's for a thousand".  Based on my training, experience, and investigation, I believe SMITH is again stating that "Devenire", "Dennis" and another person (Scoot) robbed Jeremiah Hilson (Man

Page 14

Man) of controlled substances and money. I am aware that "20 piece" would be consistent with 20 pounds of marijuana and that drug traffickers will also use the term "piece" when referring to controlled substance. I am aware the "bowls" is also used by drug traffickers to discuss weights of crystal methamphetamine and "ice" is also used by drug traffickers when referring to crystal methamphetamine. Therefore, I further believe Smith is discussing an individual (LA) contacting SMITH to try to sell the stolen marijuana, $1,000 (a thousand) per pound (P's).

27. Case agents review a second recorded jail call from November 6, 2025, at 11:32 am. The call was prior to the MATLOCK homicide and was made by inmate M. MAYES's PIN to telephone 414-316-0829, which case agent identified as D. MAYES's telephone number following a traffic stop of D. MAYES and information provided by the service provider Verizon.

28. Case agents hear several other people with D. MAYES during the call. Case agents heard an unknown individual arguing about who was going to "wear the mask". Case agents believe that based on the discussion of multiple robberies being committed by associates of D. MAYES along with D. MAYES involvement as discussed on recorded jail calls, that the individuals with D. MAYES may have been preparing to conduct a robbery. Case agents know that individuals committing robberies are likely to wear face coverings such as masks, and this call where an argument over wearing a mask was weather related. During the recorded jail call, D. MAYES discusses an unrelated robbery and states to M. MAYES that D. MAYES was confronted in the "club" by individual. D MAYES provides the individual's name, but case agents were not sure if D. MAYES stated "Manny" or "Man Man". D. MAYES states that during the confrontation, the person had "heat". Based on my training, experience, and investigation I know those engaged in criminal conduct often refer to firearms as "heat". Therefore, I believe D. MAYES is referring to Jeremiah HILSON ("Manny" or "Man Man") confronting D. MAYES with

a firearm. M. MAYES asks "so he trying to say you got Dev bust" and D. MAYES responds, "I wouldn't say I got him bust, he got himself bust". Based on my training and experience, I believe M. MAYES is asking D. MAYES if Jeremiah HILSON is accusing D. MAYES of being part of the robbery for controlled substance and money ("you got Dev bust"). D. MAYES then clarifies that he did not get Jeremiah HILSON robbed ("I wouldn't say I got him bust"), but that Jeremiah HILSON's conduct led to him being a victim of the drug and money robbery ("he got himself bust"). Later in the call D. MAYES states "Nigga Dev said Baby D you got me robbed for 20 thousand and I said nobody robbed you get your ass on 24. He pulled up on 24 he got cash and the nigga Destiny used to fuck with in the car with him, I asked if they was robbing me and they said no". Based on my training and experience, I believe D. MAYES is discussing Devenire ("Dev") accusing D. MAYES ("Baby D") of trying to robbing Devenire for controlled substances ("20 thousand"), but D. MAYES denied. D. MAYES then appears to tell Devenire to meet with D. MAYES and D. MAYES was concerned the Devenire was attempting to rob D. MAYES. Based on my training and experience, I know those engaged in drug trafficking often carry large amounts of cash and the controlled substances in which they indent to sell. Further, I know that drug traffickers are a target of robberies, given the large amount of cash and controlled substance in which they carry with them and the reality that those engaged in illegal conduct are unlikely to report the robbery to law enforcement. Therefore, drug traffickers are often concerned when meeting drug buyers and conducting drug transactions due to the risk of robbery, especially when large quantities of controlled substances are being sold.

29. Case agents also reviewed a record jail call from November 11, 2025, at 6:31 pm from inmate M. MAYES's PIN, to telephone number 262-316-1448, believe to be used by Anthony SMITH (AKA "Crack"). This call was after the homicide of Devenire MATLOCK.

During the record jail call, M. MAYES asks "They took Devenire down". Based on my investigation, I believe M. MAYES is referring to the homicide of MATLOCK. SMITH states "yes" and MAYES asks "who". SMITH replies "I don't know", but goes on to explains how MATLOCK was located. SMITH states "They bust him, they got in the car with him, they had him in the car took the gun and some more shit". Based on my training, experience and investigation, I believe SMITH is stating that MATLOCK set up to be robbed ("They bust him) and that is how he ended getting killed. I further believe that during the robbery a firearm and controlled substances were taken ("took the gun and some more shit").

30. During MATLOCK's homicide investigation, case agents learned that family members provided MPD with MATLOCK's known telephone number, which was 414-502-1599. Case agents reviewed call detail records for MATLOCK's telephone 414-502-1599. Case agents observed that between May 2025 and November 2025, MATLOCK's telephone 414-502-1599 had at least 67 contacts with D. MAYES's telephone number 414-316-0829. Further, case agents previously identified as "Man Man" as a nickname used by Jeremiah HILSON. Case agents also know that HILSON is known to reside at a location identified as 32XX North 42nd Street, Milwaukee, Wisconsin and has previously been federally indicted related to an drug trafficking organization engaged in the sale of large quantities of marijuana, methamphetamine, cocaine, and fentanyl. Based on the investigation, case agents believed that "Devenire" discussed in the above jail calls was MATLOCK. Further, based on my training, experience, and investigation, I believe drug traffickers believed MATLOCK was involved in the robbery of Jeremiah HILSON. Case agents were unable to confirm a number for Jeremiah HILSON and was unable to confirm if the "Man Man" that was robbed was Jeremiah HILSON, given no police report was ever filed.

### D. JEREMIAH HILSON SHOOTING

31.     On the afternoon of December 2, 2025, case agents learned that Jeremiah HILSON had been shot in front of his residence, while he was inside his vehicle, at 32XX North 42nd Street, Milwaukee, Wisconsin. Case agents learned that MPD was actively investigating the shooting. Case agents subsequently learned that Jeremiah HILSON was shot eight times, and that investigators believed that there were at least 31 shots fired at Jeremiah HILSON with at least two different caliber firearms.

32.     Case agents were notified that Jeremiah HILSON was transported to the hospital and was in surgery at the time. Case agents were informed that there was no immediate suspect identification, but Detective believe a Honda Pilot was involved with the shooting based on witnesses' statements. Jeremiah HILSON was uncooperative when being questioned by officers while being transported to the hospital.

33.     Case agents learned that MPD Detectives arrived on scene of Jeremiah HILSON's shooting. While investigating the shooting, Detectives located "empty bags" and a small amount of US Currency. Detectives described these bags as plastic sandwich bags and empty "fanny pack" bags. Based on my training and experience, I know that drug traffickers will often use bags, like "fanny pack" to store controlled substances for sale. I also know that drug traffickers will often use plastic sandwich bags to place controlled substance inside this other bags (fanny pack). Based on my training, experience, and review of jail calls, the items located inside Jeremiah HILSON's vehicle was consistent with drug activity and drug packaging. Based on Detectives' training and experience, they informed case agents it appeared someone had gone through the vehicle prior to law enforcement arriving on scene. Detectives did identify at least two apple iPhones (**TARGET TELEPHONES**) inside of Jeremiah HILSON's vehicle, which was described as a 2014 white Honda Accord sedan, bearing Wisconsin license plate AXN-1014, listing to a Fabian EDMOND

Page 18

(Accord). Detectives informed case agents that the two apple iPhones (**TARGET TELEPHONES)** were not collected as evidence. Case agents were also informed that the Accord had multiple bullet holes and a very large amount of blood inside, due to the Jeremiah HILSON suffering multiple gunshot wound inside of the Accord. Case agents were informed that the Accord was, which appeared to be the main crime scene, and its contents were released to Jeremiah HILSON's family prior to MPD clearing the scene. Case agents are unaware of if any photos of the scene were obtained or Jeremiah HILSON's two apple iPhones (**TARGET TELEPHONES)**.

### E. HAMPTON Jr.'s Prison Calls

34. As part of the investigation into the drug trafficking, drug robberies, and shooting of Jeremiah HILSON's, case agents reviewed multiple prison calls by several inmates.

35. Case agents located record prison calls made from inmate Quntrell Taylor's PIN to telephone number 262-894-9776. Case agents had previously identified telephone number 262-894-9776 as HAMPTON Jr.'s after reviewing jail calls, toll analysis, and open-source record database which listed the phone being registered to Ka'Lynn Baxter, who case agents identified as HAMPTON Jr's girlfriend.

36. Case agents reviewed the prison calls from December 2, 2025 and December 3, 2025 to telephone number 262-894-9776, in which HAMPTON Jr. discusses Jeremiah HILSON's shooting. HAMPTON Jr. discusses being on Facetime with Jeremiah HILSON at the time of shooting. and HAMPTON Jr. also discusses obtaining Jeremiah HILSON's cellphones after the shooting.

37. For example, on December 2, 2025 at 12:36 pm Quntrell Taylor' PIN contacts telephone number 262-894-9776, which case agents identified as HAMPTON Jr., based on interactions with HAMPTON Jr. from the prior investigation and recognizing HAMPTON Jr.'s

Page 19

voice.

> **HAMPTON Jr**: Shit, chillin *inaudible* Man Man got his ass shot up bro
> **TAYLOR**: *Inaudible*
> **HAMPTON Jr:** On my kids. Somebody pulled up on him in front of his house, shot his whole car up. Shot cuz the fuck up *inaudible* on my kids. He in surgery right now though.
> ….
> **HAMPTON Jr**:  Hell yeah. He got popped. He was on the phone with me bro, when that shit happened. On Facetime. *Inaudible* you know he got the phone set up in the car, you know how you talk to a motherfucker in their car.
> **TAYLOR**: Yeah
> **HAMPTON Jr**: He had the phone set up you know what I'm saying. They got to shootin the car up I'm like, cuz pull off pull off he like cuz cuz cuz. I'm like pull off cuz, you know what I'm saying. He hopped out the back, cuz that shit crazy. That shit crazy bro I'm not even gonna lie to you. But that shit *inaudible* I'm lookin at that shit happen and I'm like what the fuck. *Inaudbile* not responding or nothin.
> **…**
>
> **HAMPTON Jr**: Yeah I'm trying to figure it out too bro. Swear to god I'm trying to figure it out.
> **TAYLOR**: *Inaudible* they try to kill cuz ass.
> **HAMPTON Jr**: Hell yeah they'd try to kill him. Hit his head, hit him in his leg, hit him in his back, hit him in his arm.
> **TAYLOR**: Yeah they try to kill cuz ass.
> **HAMPTON Jr**: They tried to do that to him. I don't know who would want to do that to him.
> **TAYLOR**: *Inaudible* that shit.
> **HAMPTON Jr**: Then I be thinking about these cases too. Like he got that case with uh Nut.
> **TAYLOR:** Yeah
> **HAMPTON Jr**: *Inaudible* you know what I'm saying. I don't trust motherfuckers. If Man Man had an informant with him the whole time then that nigga probably, I don't know dude, but I don't know. Like where could it come from though like I'm trying to figure it.
> **TAYLOR**: Right. Yeah.
> **HAMPTON Jr**: Then he tried, did a motherfucker try to rob him cause he's like cuz cuz cuz! Then I was just like, then I hear the shooting. *Made shooting noises* You know what I'm saying?
> **TAYLOR**: Oh say they probably hopped out, they probably jumped out with guns and shit and got the shoes.
> **HAMPTON Jr**: Uh huh
> **TAYLOR**: *Inaudbile* cuz you haven't talked to him yet so you probably don't really know.
> **HAMPTON Jr**:  I don't know how the shit went I ain't talked to him.
> **TAYLOR:** Damn dog. Good thing his ass stayed though, shit. Still alive, shit.
> **HAMPTON Jr**:  Hell yeah he was breathing and shit.

Page 20

**TAYLOR:** Motherfucker gotta figure that shit out bro cuz shit cuz, he Man Man.
**HAMPTON Jr**: *Inaudible*
**TAYLOR:** Be careful out there man
**HAMPTON Jr**: *Inaudible*
**…**

**HAMPTON Jr:** *Inaudible* cuz phones. They been ringing like a motherfucker. Man Mans phones. Man Mans phones. I've got his phones, somebody that's out there, they had his phones.
**TAYLOR**: Good thing cuz got away man I ain't gonna lie foo.

38. Based on my experience, training, and investigation into these matters, I believe HAMPTON Jr. and Taylor are discussing the shooting of Jeremiah HILSON, who they refer to as "Man Man" and "cuz". I believe this based on the details of the shooting incident, the location of "Man Man" being in the hospital at the time of call, and the reference having a case with "Nut" who was previously identified as Montrell HILSON. Further, I believe HAMPTON Jr. was on a video call with Jeremiah HILSON at the time of the shooting, given the detail HAMPTON Jr. provided in the record call. Further, based on HAMPTON Jr.'s statement it appears Jeremiah HILSON may have been being robbed for controlled substance (they probably jumped out with guns and shit and got the shoes) based on my training and experience, I know that drug trafficker will refer to controlled substances as shoes. Further, based HAMPTON Jr's statement, I believe he has Jeremiah HILSON's cellphone, and likely has his drug trafficking line. I know from experience and training that drug trafficker will often have multiple cellphone, which include cellphones for personal contacts and separate cellphones for their drug trafficking business, commonly referred to drug lines. I also know that drug trafficker's drug lines are used by drug customers and, depending on how successful a drug trafficker is and/or the numerous of drug customer, will commonly ring often. Further, I know that drug trafficking operations will often share drug trafficking line with its member, especially when a drug trafficking member will be unavailable to conduct drug sales. This is done to keep the drug customer base and be available

for drug sales. Based on HAMPTON Jr's statements, I believe he possess Jeremiah HILSON's drug trafficking lines ("cuz phones. They been ringing like a motherfucker. Man Mans phones. Man Mans phones. I've got his phones, somebody that's out there, they had his phones") **(TARGET TELEPHONES)**. I further believe HAMPTON Jr. received **TARGET TELEPHONES** in order to continue to engage in drug trafficking sales for Jeremiah HILSON while he is in the hospital and recovering from his injuries.

39. On December 3, 2025 at 6:25 pm Quntrell Taylor's PIN contacts telephone number 262-894-9776, which case agents identified as HAMPTON Jr., based on interactions with HAMPTON Jr. from the prior investigation and recognizing HAMPTON Jr.'s voice. During the call, HAMPTON Jr. indicates he is traveling to his "crib" which based on my training and experience, would be consistent with HAMPTON Jr. being at his residence, 3957 North 98th Street, Milwaukee, Wisconsin (Target Location). Further, HAMPTON Jr. discusses seeing Honda Pilot when he arrived at this residence.

> **...**
> **TAYLOR**: Yeah, you on the way to the crib?
> **HAMPTON Jr:** I'm finna be pullin up at the crib right now.
> **TAYLOR**: *Inaudible*
> **HAMPTON Jr:** Hell yeah cuz, he at the hospital though.
> **TAYLOR**: Oh, he still at the hospital?
> **HAMPTON Jr:** Yup
> **TAYLOR**: You talk to Da Da?
> **HAMPTON Jr:** Da Da called me yesterday, yup.
> **TAYLOR**: Oh
> **HAMPTON Jr:** Hell yeah
> **TAYLOR**: Okay. I ain't on shit man.
> **HAMPTON Jr:**- I ain't on shit neither. I'm trying whats with this fuckin car sittin in front of my crib.
> **TAYLOR**: *Inaudible*
> **HAMPTON Jr:**- It's a, Honda Pilot. No bullshit, that motherfucker in front of my crib.
> **TAYLOR**: It's tinted?
> **HAMPTON Jr:**- Yeah it's tinted, its an old ass one sittin right there.
> …

Page 22

40.     Based on my training, experience, and investigation into this matter, HAMPTON Jr.'s statement regarding the Honda Pilot is consistent with his concerns that the individuals involved in Jeremiah HILSON's shooting maybe now be looking for HAMPTON Jr or attempting to cause violence to HAMPTON Jr. also.

**F.   Location of HAMPTON JR. and Jeremiah HILSON's cellphones**

41.     From a prior investigation that, on March 27, 2025, case agents conducted physical surveillance at Jeremiah HILSON's residence, 32XX North 42nd Street, Milwaukee, Wisconsin. At approximately 4:40 pm an unidentified male, described as black male in the late 20s, was observed exiting the front of 32XX North and entering the driver position of a 2020 Lexus NX, bearing Wisconsin license plate APT-3844 (Lexus). Case agents recognized and later confirmed through Wisconsin Department of Motor Vehicles that the Lexus was registered to Ka'lynn Amaria Gena Baxter (DOB XX/XX/2000). Baxter is a known girlfriend of HAMPTON JR. The Lexus subsequently drove away. Case agents learned that on March 23, 2025, Baxter updated her address through the Wisconsin Department of Transportation, to 3957 North 98th Street, Milwaukee, Wisconsin (Target Location). Case agents previously reviewed records which provided that Baxter was the account holder for utilities at 3957 North 98th, Milwaukee, Wisconsin (Target Location).  Case agents have requested update records, but have not received the records yet.

42.      Based on this information case agents believed HAMPTON Jr. and his girlfriend, Ka'Lynn Baxter may still be residing at 3957 North 98th, Milwaukee, Wisconsin (Target Location).

43.     From late April through June 2025, case agents have occasionally conducted surveillance at the 3957 North 98th Street, Milwaukee, Wisconsin (Target Location).  During the

surveillance case agents have observed HAMPTON Jr. present at 3957 North 98th Street, Milwaukee, Wisconsin (Target Location). Also, during this time, case agents observed a 2020-2021 grey Jeep Grand Cherokee Sport Utility vehicle, with matching grey rims and a "Napleton Auto Group" dealer placard displayed on the rear registration bracket (Jeep)(Target Vehicle 2) parked in the rear of the residence located at 3957 North 98th Street, Milwaukee, Wisconsin (Target Location). Case agents observed that there was no visible vehicle registration and no other identifying markings which would assist in trying to identify who the Jeep is registered to.

44. On May 7, 2025, May 15, 2025 and May 19, 2025, case agents conducting surveillance observed HAMPTON Jr. at entering and/or exiting 3957 North 98th Street, Milwaukee, Wisconsin (Target Location) and operating the Jeep.

45. On December 4, 2025, case agents conduct surveillance at 3957 North 98th, Milwaukee, Wisconsin (Target Location) observed the Lexus parked in front of residence on the street. Case agents did not observe the Jeep at the location on this date.

46. On December 6, 2025, case agent conducted surveillance at 3957 North 98th, Milwaukee, Wisconsin (Target Location). Case agents observed a Jeep parked in the rear of the residence near a garage with the address marker "3957" on it. Case agents did not observe HAMPTON Jr. or Baxter during this surveillance period. Case agents did note that the Jeep is believed to be the same Jeep that case agents had observed HAMPTON Jr. operating in the May and June 2025, and had obtained a federal search warrant allowing for the installation of a GPS tracking device due to case agents knowledge and belief that HAMPTON Jr. was involved in the sales and trafficking of illegal narcotics after his release from custody on the original indictment (25MJ68). Case agents were unable to place the GPS on the Jeep and later learned through surveillance, that HAMPTON Jr. was operating a Tan Ford F-150 and a Gray Chevy Silverado, all

Page 24

bearing dealer plates, and did not appear to be registered.

47.    On December 8, 2025, case agents were conducting surveillance at 3957 North 98th, Milwaukee, Wisconsin (Target Location). Case agents the Jeep pull up and park in front of the residence at 11:40 am. Case agents observed Baxter exit the front passenger seat and enter the 3957 North 98th, Milwaukee, Wisconsin (Target Location) through the front doors. Based on the observation, Baxter appeared to have used keys to unlock and enter 3957 North 98th, Milwaukee, Wisconsin (Target Location). A short time later, Baxter exited 3957 North 98th, Milwaukee, Wisconsin (Target Location) and entered the front passenger seat of the Jeep. The Jeep then drove aware, traveling past case agents conducting surveillance. I observed HAMPTON Jr. as the driver of the Jeep, who I was familiar with based on his federal indictment, and drug trafficking investigation in the summer of 2025.

48.    Case agents noted they were able to hear dogs barking during the December 2, 2025 recorded jail calls made to HAMPTON's telephone number 262-894-9776.

49.    Case agents reviewed HAMPTON Jr.'s public Instagram account, "exotic_trending_bullies_". Case agents observed this account appears to be created for the purpose of selling dogs. Case agents learned of HAMPTON Jr.'s Instagram account during a recorded prison call with TAYLOR in September 2025. During the record prison call HAMPTON Jr. discussed his dog having puppies and the Instagram page, "exotic_trending_bullies_", where HAMPTON Jr. "advertises" them. Case agents observed that there was a post on November 19, 2025 titled " 2X King Kings available tap in". This posted had a video showing several pit bull puppies in a yard area (Screen shots below Figures 1, 2, and 3).

  

Figure 1                  Figure 2                  Figure 3

50.      Case agents noted that the older brown wooden fence and decking in the video which is consistent with the wooden deck in the rear of the residence located at 3957 North 98th Street, Milwaukee, Wisconsin (Target Location).   Further the walkway to the south of the residence to the backyard, is also consistent with the video.

51.      This leads case agents to believe that HAMPTON Jr. created this video of the dogs at 3957 North 98th Street, Milwaukee, Wisconsin (Target Location) and is still residing at the Target Location, due to the recent record jail call in which the dogs are barking in the background, HAMPTON Jr. discusses the dogs at the location; and HAMPTON Jr. indicated he was at home.

52.      Case agents are now seeking for a search warrant to allow for the search of HAMPTON Jr., HAMPTON Jr.'s residence, the Jeep and the Lexus, to locate the **TARGET TELEPHONES**, which MPD did not seize on December 2, 2025 and HAMPTON Jr. indicated on the record prison call from December 2, 2025 he possesses. Based on the numerous record jail/prison calls and investigation into MATLOCK's homicide, case agents believe Jeremiah HILSON is once again involved in the sale and trafficking of controlled substance and be

Page 26

possessing a firearm in furtherance of drug trafficking.  Case agents further believe **TARGET TELEPHONES**, which HAMPTON Jr. has possession of, may contain evidence of these violations.  Case agents do believe that the violence related to the drug trafficking could continue to escalate, due to the known shootings of those involved in this investigation and the lack of cooperation with law enforcement.

## <u>TECHNICAL TERMS</u>

53.     Based on my training and experience wireless telephone (or mobile telephone, or cellular telephone), like the **TARGET TELEPHONES**, is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities includes: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device, and geolocation information indicating where the telephone was a particular time. In my training and experience, examining data stored on wireless telephones can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

Page 27

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

54.     As described above, this application seeks permission to search for the **TARGET TELEPHONES**.  Based on my knowledge, training, and experience, I know that wireless telephones, like the **TARGET TELEPHONES** can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.  If the **TARGET TELEPHONES** are located and seized by law enforcement, law enforcement will submit a separate affidavit requesting a warrant for a forensic extraction of the **TARGET TELEPHONES**.

## CONCLUSION

55.     For the reasons discussed herein, there is probable cause to believe that Jeremiah D. HILSON, a.k.a. "Man-Man", Maurice F. HAMPTON Jr., a.k.a. "Big Droop", "Droop", and other identified and unidentified subjects, have committed violations of federal law, including possession of a firearm in furtherance of drug trafficking, possession of a firearm by a person under indictment, distribution and possession with intent to distribute controlled substances, use of a communication device to facility a drug trafficking offense, and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 18, United States Code, Sections 924(c) and 922(n); and Title 21, United States Code, Sections 841, 843, and 846.  I further submit that there is probable cause to believe that located at the Target Location, Target Vehicles, and/or Target Subject described in Attachment As, there is evidence of their crimes, as detailed more specifically in Attachment B, such that a warrant issue authorizing the search of the same.

# ATTACHMENT A1

## PLACE TO BE SEARCHED

**Attachment A1: 3957 North 98th Street Milwaukee, Wisconsin -** to include the garage (Target Location). This address is utilized by Maurice HAMPTON Jr. and Ka'Lynn A.G. Baxter. Described as a one-story, single-family residence with a tan/brown roof. The roof has bark brown gutters affixed with cream colored brick and dark brown shingle style siding. A small concrete porch leads to the front entry door. The residence is situated on the west side of North 98th Street with the front entrance facing east. "3957" is affixed to a wooden column on the north side of the front door. The main entry door has a glass/screen style storm door leading to a solid entry way door. The garage and vehicle slab is located adjacent to the alleyway behind the residence. The garage has cream colored siding with a brown roof and dark brown gutters affixed with "3957" affixed next to the garage overhead door which faces west.





# ATTACHMENT A2

# VEHICLE TO BE SEARCHED

2020 Lexus NX, bearing Wisconsin license plate APT-3844 (Lexus) (Target Vehicle 1).



## ATTACHMENT A3

## VEHICLE TO BE SEARCHED

2020-2021 grey Jeep Grand Cherokee Sport Utility vehicle, with matching grey rims, and a "Napleton Auto Group" dealer placard displayed on the rear registration bracket (Jeep) (Target Vehicle 2);



Page 31

# ATTACHMENT A4

## PERSON TO BE SEARCHED

The person of Maurice F. HAMPTON Jr, a.k.a. "Big Droop" (DOB XX/XX/1997) (Target Subject).



Page 32

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

Two Apple iPhones, previously possessed by Jeremiah HILSON on December 2, 2025 and later provided to Maurice HAMPTON Jr. as described on recorded jail call from December  2, 2025 (**TARGET TELEPHONES**), which may be found at the Target Location, Target Vehicle 1, Target Vehicle 2, and/or on the Target Person.

Page 33